**ATLANTIC COAST LINE R. CO. et al.**

v.

**ROBERTSON.**

No. 6802.

United States Court of Appeals
Fourth Circuit.

Argued June 10, 1954.

Decided July 20, 1954.

---

6. Williston on Sales, 2nd Ed. Vol. 1, Sec. 159.

Douglas McKay, Columbia, S. C. (McKay & McKay, Columbia, S. C., on brief), for Atlantic Coast Line R. Co.

Joseph L. Neetles, Columbia, S. C. (Thomas, Cain & Neetles, Columbia, S. C., on brief), for Lock Joint Pipe Co. and American Pipe & Construction Co.

Henry Hammer and Henry H. Edens, Columbia, S. C. (Marshall Williams, Orangeburg, S. C., and John H. Dukes, Myrtle Beach, S. C., on brief), for H. L. Robertson.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

SOPER, Circuit Judge.

H. L. Robertson of Sumter, South Carolina, lost both legs below the knees when he was run over on the morning of June 9, 1952 by a dinkey engine on the premises of the Lock Joint Pipe Company and the American Pipe & Construction Company which they were operating as joint ventures in the manufacture of pipe near Orangeburg, South Carolina for use in the atomic bomb project of the United States. Robertson was an experienced railroad man and was stationed on the site as a car inspector of the Atlantic Coast Line Railroad Company. He brought suit against the Pipe Companies and the Railroad Company claiming that the Pipe Companies were negligent in the operation of the engine and that the Railroad Company was negligent in failing to furnish him a safe place to work. The Pipe Companies, which for the purposes of this case may be considered as one, and the Railroad Company denied liability. The Railroad Company also filed a cross complaint against the Pipe Company claiming that if it should be held liable for the accident, it was entitled to be reimbursed under the terms of an indemnity agreement between them.

The trial resulted in a verdict for the plaintiff for $50,000 against the Pipe Company, and $30,000 against the Railroad Company, and judgments for these amounts were entered,[1] and this appeal followed. The judge held that the Railroad Company was not entitled to indemnity from the Pipe Company; and from this judgment a cross appeal was taken.

The issues for determination are (1) whether there was substantial evidence to go to the jury as to the negligence of the Pipe Company; (2) whether there was substantial evidence to go to the jury as to the negligence of the Railroad Company; (3) whether the plaintiff was guilty of contributory negligence as a matter of law; and (4) whether the Railroad Company was entitled to be indemnified by the Pipe Company.

There is little or no dispute as to the facts. The defendants relied upon the cross examination of witnesses for the plaintiff and offered no independent testimony as to the circumstances of the accident. The manufacturing operations of the Pipe Company were located in a flat yard or area about one-half mile square located on the main line of the railroad near Lesesne Station, South Carolina. Under an agreement between the Railroad Company and the Pipe Company fifteen railroad tracks were constructed within the area, eight of which were used for the delivery of material to the Pipe Company within the area and for the transportation and delivery of completed pipe to the bomb plant of the United States at Dumbarton Station outside the area. These tracks ran east and west, five of them along the northern and three along the southern boundary of the area. The distance between the north and south boundaries of the area was about 775 feet. The plaintiff's duties were directed chiefly to these tracks and the cars placed thereon.

Midway between the north and south boundaries of the yard was another series of parallel tracks, seven in number, on which the Pipe Company operated a dinkey engine to haul flat cars carrying steel forms and other material along side the bays where the pipe was cast and between a steel yard to the west and an oil house to the east where the forms were oiled and cleaned before they were used. These operations involved the constant shifting and switching of the dinkey

1. It appears that in the South Carolina courts the unique practice prevails of permitting the jury, in the case of joint tort feasors, to sever and apportion the damages. See White v. McNeily, 1 Bay 11; Jenkins v. Southern Ry. Co., 130 S.C. 180, 125 S.E. 912; Johnson v. Atlantic Coast Line R. Co., 142 S.C. 125, 140 S.E. 443; Miller, Adm'r v. Atlantic Coast Line R. Co., 140 S.C. 123, 138 S.E. 675; S. C. Quarterly, Vol. 1, Part 3, Page 214. No objection was made by any of the parties in the pending case to the entry of judgments for different amounts against the defendants.

engine and cars back and forth on the series of middle tracks. Cranes were used to load the finished pipe on the cars on the outside tracks, and cranes were also located on the middle tracks to shift the materials from the cars to the bays for the casting of the pipe. The longest of the tracks in both series approximated one-half mile in length. Seventy-two cars with certain extras were furnished by the Railroad Company for the operations on both series of tracks. The dinkey engine, however, belonged to the Pipe Company.

The casting of the pipe was accompanied by the emission of quantities of steam from large kilns along side the tracks, as well as clouds of dust from the cement employed. The operation also involved the use of a number of vibrators and cement mixers as well as the cranes located on the tracks for the handling of the material, and the result was that the operations were accompanied by loud noises. Hence it was sometimes difficult either to see or to hear the dinkey engine as it moved on the center tracks.

Robertson was also occasionally called upon by the Pipe Company to inspect and repair the flat cars on the center tracks, incuding the track on which he was injured. He himself made minor repairs to these cars and to the cars on the outside tracks. It was also his duty to inspect and repair the cars on the main track between the yard of the Pipe Company and the railroad station where delivery was made to the bomb plant. In view of these circumstances the Railroad Company furnished Robertson with a pick-up truck and the Pipe Company gave him space for spare parts and tools in the plant warehouse in the northwestern corner of the yard. A road which gave access to the leading tracks crossed the yard on the south side but did not cross the manufacturing area; but it was possible for the truck to reach the tracks on both sides of the area.

The dinkey engine of the Pipe Company was operated by a driver who sat on the right hand side of the cab. He could see the tracks immediately in front of him but his view to the left was obstructed by the housing of the motor which was in the middle of the vehicle forward of the cab. Ordinarily another employee of the Pipe Company rode on the engine to operate the switches and uncouple the cars. Sometimes he rode in the front of the engine where he could see and give warning to persons crossing the track, but as often as not he rode on the rear of the engine in order to do his work the more quickly. He was in the latter position at the time of the accident.

No regular crossings of the center tracks were provided, but at or near the place where the accident happened a switch was located and the workmen in the plant were accustomed to cross the track at this point in going about their work in connection with the manufacture of the pipe and tying down sections of the pipe on the flat cars. Certain outdoor toilets for the workmen were located a short distance south of this switch. It was also the practice of the workmen in the yard and of Robertson to cross the central tracks at any other place they saw fit, and this practice was well known to the defendant Pipe Company.

On the day of the accident Robertson, while inspecting the cars on the southern loading tracks, noticed that a brake shoe was needed on one of the cars. He had one in his truck which was then parked on the north side of the yard, and in order to get it he endeavored to cross the central tracks from south to north when he was struck down by the dinkey engine coming from the east on his right side. He could have reached the truck without crossing the central tracks by walking a much longer distance around their ends, but he followed his usual practice of going directly to his objective. Crossing the tracks he looked to the right but did not see the approaching engine as it was obscured by the steam and dust, and he did not hear it because of the noise caused by the manufacturing operations. He also looked to his left and saw a large crane about 50 feet distant which was standing on the track he was about to cross, swinging its boom and picking up

forms. He testified that under these conditions he had no idea that anything else would be approaching on the same track in the direction of the crane and hence he ventured to cross and was hit.

The Pipe Company contends that under these conditions it owed no duty to look out for Robertson crossing the middle tracks unless they called upon him to inspect or repair cars placed thereon. They argue that as he was not their employee and was not obliged to cross the central tracks in order to reach the loading cars north and south, it had no reason to anticipate his crossing at a place where no crossing was provided and no reason to keep a special lookout for him. They contend that at most he was a licensee to whom they owed no duty except to avoid injury when they had actual knowledge that he was in a position of danger. See Restatement of Torts, §§ 341, 342, 343.

This view, however, leaves out of account the circumstances which led to the employment and fixed the status of Robertson at the plant, and created the obligations which the defendant corporations owed him in the performance of his duties. On November 1, 1951 the Railroad Company and the Pipe Company entered into an agreement under which the track facilities, referred to therein as a "sidetrack" were constructed for "the economical and convenient conduct of the business of the Industry." The agreement provided for the construction and maintenance of the side track to the satisfaction of the Railroad Company, the operation thereof by the Railroad Company, with the right on its part to enter the premises for purposes of construction, maintenance and operation. Provision was also made for the delivery by the Railroad Company of carload shipments to the Pipe Company and also the delivery of empty cars for loading and shipment by the industry to destinations on the railroad.

In the performance of this contract the Railroad Company assigned seventy-two flat cars to the work, some of which were used with the dinkey engine by the Pipe Company in the middle tracks in connection with the manufacturing operations; and the Railroad Company directed Robertson to act as a car inspector in the yard. He assumed this position and was continuously employed in the performance of his duties with the knowledge and consent of the Pipe Company from January 21 to June 9, 1952, when he was injured.

■ Bearing this situation in mind there was substantial evidence tending to show that the Pipe Company negligently operated the engine and the cars moving on the central tracks in the course of the manufacturing operation. The uncontradicted evidence shows that the Pipe Company had reason to anticipate that not only Robertson but also its own employees were likely to cross these tracks at any time and at any point in the performance of their duties; and hence the operation of the engine in the manner described was particularly negligent in that the driver of the engine did not have a clear lookout to his left and the second workman on the engine did not customarily ride on the front so as to give warning of its approach, and the manufacturing operations involved the creation of so much steam and dust and loud noises, that it was difficult for the employees to see or hear the engine as it approached.

■ Under these circumstances there arose the well defined duty on the part of the Pipe Company to look out for the workers crossing the track, which has been established in numerous cases decided by the Supreme Court of South Carolina, including Hayes v. Atlantic Coast Line R. Co., 196 S.C. 386, 391–392, 13 S.E.2d 921, 923, where the court said:

"A review of the foregoing cases, and many others, shows that our Court, along with a majority of the Courts of other jurisdictions, has adopted what might be termed a liberal view, to the effect that a railroad does or may owe a duty to anticipate the presence of persons along or crossing its tracks at a well-defined pathway at a place in which it has acquiesced in a somewhat gen-

eral use thereof (not amounting to a legally established public use), or where the circumstances have been such that the presence of persons on or along the tracks at that particular place may reasonably be expected.

"In accordance with this rule, the relation to the railroad company of one injured at such place, is not necessarily that of a naked trespasser, but his status may be that of a licensee, and as such it would be the duty of the railroad company to exercise ordinary care so as to prevent injury to him."

See also, Nettles v. Southern Ry. Co., 211 S.C. 187, 44 S.E.2d 321; Jones v. Atlanta Charlotte Air Line Ry. Co., 218 S.C. 537, 63 S.E.2d 476, 26 A.L.R.2d 297; Goodwin v. Atlantic Coast Line R. Co., 82 S.C. 321, 64 S.E. 242; 44 Am.Jur. Railroads, § 438.

■■ It is also manifest that there was substantial evidence to go to the jury as to whether the Railroad Company failed in its non-delegable duty to furnish its inspector a safe place to work when it directed him to inspect and repair the cars in the Pipe Company's plant. Such a duty on its part existed even though the work was to be performed on another's property. Bailey v. Central Vermont Ry., 319 U.S. 350, 63 S.Ct. 1062, 87 L.Ed. 1444; Ellis v. Union Pacific Ry. Co., 329 U.S. 649, 67 S.Ct. 598, 91 L.Ed. 572; Chesapeake & Ohio Ry. Co. v. Thomas, 4 Cir., 198 F.2d 783; Terminal Railroad Ass'n v. Fitzjohn, 8 Cir., 165 F.2d 473, 1 A.L.R.2d 290. The conditions prevailing in the yard at the time of the accident were not sporadic or unusual, but customary and continuous; and hence there was substantial basis for the finding that the Railroad Company failed to exercise ordinary care to provide for the safety of its employee when it directed him to perform the duties of car inspector in the area.

■ The issue of contributory negligence on Robertson's part is not free from difficulty; but we think it was not erroneous to submit it to the jury for determination. He was a mature and ex-perienced railroad man and no one knew better than he the dangers attendant upon crossing the tracks on which the dinkey engine ran. On the other hand, his duties required him to inspect and repair cars on all of the tracks in the yard and more frequently those placed along the north and south boundaries to receive the completed pipe. Hence he was obliged to cross from one side to the other of the area. It was physically possible to go around the ends of the central tracks without crossing them, but since the lateral distances were substantial, this would have caused considerable additional effort and delay; and as the employees of the Pipe Company crossed the tracks continually, it was not unreasonable for him to do the same. Of course ordinary prudence on his part required him to keep a careful lookout in crossing; but there is evidence that at the time of the accident he looked both ways before crossing, and although he did not have a clear vision to the right, he did see the crane in action on the track a short distance to his left and assumed, not without reason, that nothing else was approaching. Whether or not he used the care to be expected of a cautious man in these circumstances was a jury question.

■ The last question relates to the correctness of the ruling of the judge as a matter of law that the Pipe Company was not obliged to indemnify the Railroad Company for the latter's liability under the judgment rendered against it in favor of the plaintiff in this case. The issue arose under a cross complaint filed by the Railroad Company against the Pipe Company and was determined by the judge who correctly held that it was a question of law for him to decide. He refused a motion for a directed verdict in favor of the Railroad Company against the Pipe Company, to be entered in case of a verdict in favor of the plaintiff against the Railroad Company, and submitted the issue to the jury, but the jury did not pass upon it. After the verdict was rendered in favor of the plaintiff against both defendants, it was suggested that the jury be sent back to pass upon the question of indemnity; but the judge

concluded that it was a question of law for the court and no further action was taken at this time. Later the Railroad Company moved for a judgment *n. o. v.* in its favor against the Pipe Company for $30,000, but this motion was overruled. It would have been more in accord with approved procedure if the jury had been directed to render a formal verdict against the Railroad Company on this issue, but no point is now made of this technical omission and we shall decide the question on the motion *n. o. v.* as if a verdict against the Railroad Company had been actually entered.

The decision turns on the interpretation of the agreement between the defendant companies, to which reference has already been made. In addition to the terms above set out the agreement provided that inasmuch as the industry desired and requested the construction and operation of the sidetrack for its convenience, the industry assumed the duty of keeping the sidetrack free of combustible material and agreed to hold the Railroad Company harmless from all claims for any loss or damage by fire to the property of the industry or the property of other persons. Thereafter the agreement contained the following paragraph 11 entitled "Operations and Liability (Continued)":

"(a) The Industry shall have the right to switch with its own power over said sidetrack cars delivered to it by the Railroad under the terms hereof; liability for said cars and contents to be determined in accordance with preceding provisions of this article, except that the Industry will pay to the Railroad the loss due to damage to or destruction of any car or cars delivered to the Industry and by it switched, regardless of the cause of such damage or destruction.

"(b) The Industry shall assume, and it hereby assumes, responsibility for and agrees to pay, and also agrees to indemnify and hold the Railroad harmless from and against all loss, damage, cost, liability, judgments or expense (including necessary counsel fees), in connection with any loss, injury or damage of any and every character and howsoever caused, whether to employes of either party or to third persons, or to the property of either party hereto, or of other persons, that may be sustained or incurred in connection with or arising from or growing out of the operation of said switching power of the Industry over the said sidetrack."

The Pipe Company bases its argument on a narrow and untenable construction of these provisions. It points out that in paragraph 11(a) the Industry is given the right to switch with its own power over said sidetrack cars delivered to it by the Railroad, and that the agreement to indemnify, contained in Section 11(b), is specifically directed against loss that may be sustained in "the operation of said switching power of the Industry over the said sidetrack." It is contended that this language refers only to the operation of the cars on the tracks on the north or south of the premises and hence the indemnity agreement did not cover the operation of the dinkey engine on the middle or manufacturing tracks in the manner in which it was engaged at the time of the accident.

The short answer to this argument is that at the very beginning of the agreement it was expressly stated that the "track facilities" desired by the Industry would thereafter be called "sidetrack"; and the track facilities were then described in detail as tracks 1 to 15 which included not only the loading and unloading tracks adjacent to the north and south boundaries of the area but also the middle tracks on which the dinkey engine and flat cars furnished by the Railroad Company were used in the manufacturing operations. It follows that the indemnity for loss sustained in the operation of the switching power of the industry over the sidetrack applied to all of the tracks in the area. No good reason appears why the Railroad Company should have confined the agreement for indemnity to the outside tracks to the exclusion of the central tracks on which its cars also were to be operated.

The propriety of an agreement of indemnity for loss covered by the negligence of the indemnitee under such circumstances as existed in this case is not disputed. Restatement of Contracts, §§ 572 to 575. Certainly this is true when the injury is caused by the negligent act of the indemnitor; and in this case the language is broad enough to cover loss for any injury caused by the negligence of either party to the contract, for it specifies loss, injury or damage of any and every character and howsoever caused that may be sustained in connection with the switching power of the Industry over the sidetrack. See in this connection, Buckeye Cotton Oil Co. v. Louisville & N. R. Co., 6 Cir., 24 F.2d 347; City of Cleveland v. Baltimore & O. R. Co., 6 Cir., 71 F.2d 89; Cacey v. Virginian Ry. Co., 4 Cir., 85 F.2d 976; Rice v. Penn. R. Co., 2 Cir., 202 F.2d 861.

The judgments against the appellants in favor of Robertson will be affirmed, but the judgment in favor of the Pipe Companies in the claim of the Railroad Company for indemnity will be reversed with instructions to enter judgment thereon in favor of the Railroad Company.

Affirmed in part and reversed in part and remanded for further proceedings.