**Glenn DAVIDSON, Plaintiff,**

v.

**Ernest DIXON et al., Defendants.**

**Civ. A. No. 4599.**

United States District Court,
D. Delaware.

June 20, 1974.

Motion to Vacate Judgment Denied
Dec. 20, 1974.

L. Vincent Ramunno, Wilmington, Del., for plaintiff.

Barry W. Meekins, Deputy Atty. Gen., Wilmington, Del., for defendants.

## MEMORANDUM OPINION

STAPLETON, District Judge:

Glenn Davidson, a state prisoner, here seeks compensatory and punitive damages for alleged violations of his right to due process of law and of his right to be free from cruel and unusual punishment. The defendants are the State of Delaware, Harry W. Towers, who at the relevant time was Deputy Superintendent of the Department of Corrections, Raymond W. Anderson, Warden of the Delaware Correctional Center at Smyrna —the prison in which plaintiff is housed —Harold Martin, the captain of the guard force at Smyrna, and guards Ernest Dixon and Richard Taylor.

The complaint is in two counts. The first count alleges a violation of federally secured rights; the second alleges a state claim for assault and battery cognizable under this Court's pendent jurisdiction. Trial has been held and the case is ripe for decision.

Motions to dismiss, which were filed on the eve of trial, were reserved for decision until this time. The state's motion to be dismissed as a defendant from this suit will be granted. The Eleventh Amendment precludes this Court from exercising jurisdiction over a state in any action seeking the recovery of money damages from its treasury. Ford Motor Co. v. Department of Treasury, 323 U.S. 459, 65 S.Ct. 347, 89 L. Ed. 389 (1945). As the state has not waived its sovereign immunity with respect to the claims asserted here, it may not be sued on either the common law assault claim or the Section 1983 claim. The motion of the individual defendants to dismiss will be denied. It has long been settled that agents and officers of a state, sued in their individual capacities, do not partake of the sovereign immunity of the state when it is alleged that they have acted unconstitutionally. Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908); Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L. Ed.2d 492 (1960).

On the evening of September 1, 1971, several, though not all, of the prisoners housed in the maximum security building at the Delaware Correctional Center at Smyrna, Delaware, forcibly took control of that building. The prisoners who were involved in this action blockaded several hallways of the building, took three guards as hostages and threatened to kill them. Acting decisively to quell the riot, the Director of the Department of Corrections ordered that the building be retaken.

Three groups of guards attempted simultaneous entry into the building, each through a door located at the end of one of the building's three wings. Each wing of the maximum security building houses a tier of cells; they are denominated A Tier, B Tier and C Tier. The group that attempted to enter through A Tier was initially unsuccessful in gaining entrance. The teams which entered through B and C Tiers, however, were immediately successful and met no physical resistance from the prisoners. After gaining speedy entrance, the advance of the guards who entered through B Tier was halted for several moments by barred doors at the end of the tier which had been locked and jammed by inmates. While temporarily contained behind these doors, the incoming guards witnessed one of the inmates holding a pair of scissors to the neck of a hostage and threatening to kill him. The guards, undeterred, were able after a few minutes to open the locked doors and to charge the prisoners. At this time, most of the prisoners retreated

into cells in A block and locked themselves in. The few prisoners who did not seek this refuge hid in the day room of the building. These men were brought quickly under control.

Within a short time after the guards had entered the building, all of the prisoners had been locked in cells and the hostages had been freed without harm. There was remarkably little violence necessary to effect this restoration of order. The events of the night, however, were not over; it is upon the events which followed that plaintiff would predicate liability.

While the testimony is in severe conflict, I conclude that the following facts have been shown by a preponderance of the admissible evidence. As soon as the building was securely under control of the guards, a head count of the prisoners was taken and it was ascertained that none were missing. Next, it was decided that the "ring leaders" of the disturbance should be segregated from the other inmates. This was to be accomplished by placing them in the isolation section of the building, located at the end of A Tier. Someone, although the testimony does not disclose who, gave defendant Martin a list of the names of prisoners who actively participated in the riot. Reportedly this list was prepared by someone who had watched the inmate activity from outside through the windows. Plaintiff's name was on this list although it now appears that his inclusion was an error. The parties have stipulated that the plaintiff did not take an active part in the disturbance.

During the course of the riot the machinery which ordinarily opens and closes the various cell doors on A Tier was damaged. When the inmates retreated into cells on this tier and closed the cell doors, the locks engaged and the doors could thereafter be opened only with a hand crank. After a crank was obtained, Captain Martin, in the presence of Mr. Towers and with the aid of others, began removing the prisoners whose names appeared on the list to the isolation section. The process that followed involved a systematic assault upon a substantial number of inmates.

Credible testimony of inmates, which was corroborated in important part by the testimony of a guard who was present,[*] as well as by the physical condition of the inmates afterwards,[**] establishes that the "ring leaders" were searched out, taken from the cells in which they were located, and then beaten with wooden night sticks or "batons." The testimony established a pattern: an inmate would be called forth from a cell; upon entering the corridor he would be ordered to take off his shirt; when the shirt was over his head, he would be hit with night sticks wielded by the guards. He would then be forced to run, or would be dragged, down the tier to the isolation section at the end of the corridor. Guards were standing along the length of the corridor and, as an inmate would pass by, at least some of these guards would hit or jab him with their sticks.

Early in this process plaintiff was ordered from his cell by Officer Dixon. Offering no resistance, he stepped forward. No more words were said; as Davidson reached the door of his cell, Officer Dixon took hold of plaintiff's belt with one hand and with the other

---

[*] This guard testified that he was on duty in the maximum security building during a part of the night in question. His testimony was that he viewed "several beatings" by guards. He indicated that the guards used "night sticks" and that the prisoners being beaten had not tried to assault the guards. He corroborated the testimony of others that there was a line of guards who assaulted inmates as each inmate was moved from a cell in A Tier to a cell in the isolation section.

[**] In the early morning of September 2, 1971, all inmates requesting medical attention were taken to the prison hospital. There were sixty-five inmates housed in the maximum security building at that time. Of that number thirteen were taken to the prison hospital. This thirteen included all eleven of the inmates who had been segregated in the isolation section following the riot. At least four, including Davidson, required sutures.

struck him on the head with a night stick. Dixon's first blow hit Davidson's nose; a second followed striking his forehead. Davidson was then struck in the back of the head. He fell to the ground. He was then taken to the isolation section located at the end of the corridor. During this trip Davidson was struck by defendant Martin and by unidentified others. Arriving finally at the isolation cell where he was to be kept, Davidson was stripped of all clothing and locked in the cell. He was bleeding at this time from several cuts, at least one on the top of his head, one on his forehead and one on the back of his head. Testimony of Captain Dieroff, who took plaintiff to the prison hospital about an hour and a half later, establishes that at that time Davidson's nose was swollen. Later that night the prison physician ordered an x-ray of Davidson's swollen nose. He also sutured the cuts on Davidson's head; together they required thirty-nine stitches.

Accurate identification of one's assailants in a volatile situation such as this is a difficult task and for this reason the Court examined the evidence carefully for corroboration of plaintiff Davidson's identification of the participants in the gang assault. There was ample corroboration of his testimony that he was struck by defendants Dixon and Martin and the Court is convinced that this, in fact, occurred. On the other hand, there was very little to corroborate Davidson's testimony that defendant Taylor participated in the assault and the Court has concluded that the plaintiff has not carried his burden of proof on this point.

The evidence with respect to defendants Towers and Anderson does not warrant the conclusion that either of them struck Davidson. The Court believes that Warden Anderson was not present when the assaults occurred and had no knowledge beforehand that they would occur. The situation with respect to defendant Towers is somewhat different, however.

The plaintiff has established by a preponderance of the evidence (1) that Towers was present and witnessed the beatings of Davidson and several other inmates, (2) that he had the authority to control the actions of the other state personnel present, (3) that he made no effort to prevent or stop the beatings, and (4) that the effect of his presence, his office and his failing to intervene was to sanction and encourage the guards in their unlawful activity.

■■ In order to recover on a Section 1983 claim, it is necessary for the plaintiff to show intentional conduct by one acting under color of state law which subjected him to the deprivation of a federally secured right. Howell v. Cataldi, 464 F.2d 272 (3rd Cir. 1972); Basista v. Weir, 340 F.2d 74 (3rd Cir. 1965). That the conduct of defendants Dixon, Martin and Towers in this case was both intentional and under color of state law is clear. Whether it amounts to a deprivation of a constitutionally protected right is the question to which I now turn.

■■ It is well established in this circuit, as elsewhere, that not every action that constitutes a state law tort of assault is actionable under Section 1983 when it is committed under the color of state law. Kent v. Prasse, 385 F.2d 406 (3rd Cir. 1967); Smith v. Spina, 477 F.2d 1140 (3rd Cir. 1973). It seems equally sure that, in a proper case, a state prisoner may recover under the Civil Rights Act for physical abuse of his person. Curtis v. Everette, 489 F.2d 516 (3rd Cir. 1973). Cf. Howell v. Cataldi, 464 F.2d 272 (3rd Cir. 1972). The appellate courts that have recognized an inmate's right to recover under Section 1983 for physical abuse, however, have employed no single theory in reaching their result and, consequently, have articulated no single legal test for distinguishing those acts which are merely "state torts" from those that rise to the status of a constitutional violation. See e. g., Brown v. Brown, 368 F.2d 992 (9th Cir. 1966); Wiltsie v. Cali-

fornia Department of Corrections, 406 F.2d 515 (9th Cir. 1968); Bethea v. Crouse, 417 F.2d 504 (10th Cir. 1969); Collum v. Butler, 421 F.2d 1257 (7th Cir. 1970); Tolbert v. Bragan, 451 F.2d 1020 (5th Cir. 1971).

The proper mode of analysis is indicated, I think, by the Third Circuit's recent opinion in Curtis v. Everette, 489 F.2d 516 (3rd Cir. 1973). The court there cited with approval Judge Friendly's persuasive opinion in Johnson v. Glick, 481 F.2d 1028 (2nd Cir. 1973). *Johnson* predicates an inmate's right to recover for physical abuse on the Fourteenth Amendment. It reads the Supreme Court's opinion in Rochin v. California, 342 U.S. 165, 72 S.Ct. 205, 96 L. Ed. 183 (1952) to stand for the proposition "that, quite apart from any 'specific' of the Bill of Rights, application of undue force by law enforcement officers deprives a suspect of liberty without due process of law." It then concludes that "the same principle should extend to acts of brutality by correctional officers." Johnson v. Glick, *supra* at 1032, 1033.

█ The state action held violative of the Fourteenth Amendment in *Rochin* was described by the court as "conduct that shocks the conscience," 342 U.S. 165, 172, 72 S.Ct. 205 (1952). We are instructed by the Supreme Court, however, to be cautious in applying that test. To support liability, the acts challenged must "do more than offend some fastidious squeamishness or private sentimentalism . . . . [They must] offend even hardened sensibilities," 342 U.S. at 172, 72 S.Ct. at 209, or constitute force that is "brutal", 342 U.S. at 174, 72 S.Ct. at 210. Thus, a plaintiff must show more than that he suffered an intentional tort at the hands of a defendant who was acting under color of state law; he must prove acts which amount to shocking or brutal conduct. Inescapably, the process is one of line drawing. Where the constitutional line should be drawn in any case is intimately related to the particular facts. As Judge Friendly observed in *Johnson*:

. . . In determining whether the constitutional line has been crossed, a court must look to such factors as the need for the application of force, the relationship between the need and the amount of force that was used, the extent of injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.
. . .

There will undoubtedly be cases in which the line defining Section 1983 liability will be difficult to draw. This is not one of them, however. On September 1, 1971 representatives of the State of Delaware practiced premeditated and systematic brutality under circumstances in which there was no call whatever for the application of force. The prison was under the control of the correctional staff; all inmates were secured; and those being transferred to isolation, one at a time, were offering no resistance. While sanctions would, of course, have been appropriate for those determined to be responsible for the riot, the disciplinary procedures regularly followed at the institution and the punishment regularly imposed for such conduct were ignored. Resort was to vengeance by violence, not to legal process.

█ The beating of plaintiff Davidson shocks the conscience. He was the victim of unlawful force which can fairly be characterized as "brutal." His assailants clearly violated his right to due process of law under the Fourteenth Amendment.

█ Defendants Dixon and Martin have been found to have been active participants in concerted action which included the beating of Davidson. In light of the conclusion that the beating violated plaintiff's Fourteenth Amendment rights, they are liable to him for all of the resulting injuries.

█ Defendant Towers was a superior officer to both Dixon and Martin; while he did not strike Davidson, he was present at Davidson's beating, had

knowledge of it and acquiesced in it. This is sufficient to render him liable for the injuries sustained by Davidson. His liability does not rest on the doctrine of *respondeat superior*; rather, in this situation the law considers that Towers was a direct participant in the attack. Bracey v. Grenoble, 494 F.2d 566 (3rd Cir. 1974) (Opinion of Seitz, C. J., concurring and dissenting); Byrd v. Brishke, 466 F.2d 6, 11 (7th Cir. 1972); Landman v. Royster, 354 F. Supp. 1302 (E.D.Va.1973); Wright v. McMann, 460 F.2d 126 (2nd Cir. 1972).

■ As an alternative basis for liability, the Court concludes that plaintiff has proved a common law claim for assault and battery against Mr. Dixon and Mr. Martin actionable under state law. The Court further finds that Mr. Towers is liable under Count II as one who furthered the commission of the tort by his cooperation, aid and encouragement. While there appears to be no reported Delaware case involving a comparable situation, I am confident that the Delaware courts would impose liability here under the generally accepted rule regarding concerted tortious action. See W. Prosser, Law of Torts (3rd Ed.) § 43 at 259.

Plaintiff has alleged that the blow on his nose has caused him more or less constant pain and discomfort since the time of the assault. He testified that he has undergone two operations on his nose since the time of the beating, that he requires a third operation and finally that, because of these operations, his face has taken on a new—and presumably less desirable—appearance.

Testimony at trial revealed that Davidson was taken to the Wilmington Medical Center on the day following the riot—September 2, 1971—to have his nose x-rayed. Medical records of both the prison hospital and the Wilmington Medical Center were stipulated into evidence by the parties. These records include a signed report of this x-ray study, dated September 3, 1971. The hospital radiologist stated: "There is old deformity of the nasal bones which I believe is due to a healed fracture. No definite recent fracture is noted." An expert medical witness testified that a fracture several days old would be considered a recent fracture.

I conclude that the blow which Davidson received did not break his nose. Whether it nonetheless was the cause of his continuing discomfort and necessitated the surgical operations which he has undergone is left, on this record, to speculation. The plaintiff has failed to prove a causal connection between the assault and the existing problem with his nose that the testimony reveals.

■ The pain and suffering caused by the beating, however, have been adequately shown. I conclude that One Thousand Five Hundred Dollars is fair compensation for this injury. Moreover, I conclude that this is a proper case for the award of punitive damages.

■ The Third Circuit has held that federal law governs damage questions in Section 1983 cases and that federal law permits the award of punitive damages when appropriate. Basista v. Weir, 340 F.2d 74 (3rd Cir. 1965). Here the conduct giving rise to liability was a premeditated, malicious assault. It was, moreover, an assault upon a man whom the state had taken into custody and whose care was entrusted to his assailants. Manifestly the public has a compelling interest in seeing that such conduct is deterred. Punitive damages are accordingly appropriate. Lee v. Southern Home Sites Corp., 429 F.2d 290 (5th Cir. 1970); Lampert v. Reynolds Metal Co., 372 F.2d 245 (10th Cir. 1967); Collins v. Brown, 268 F.Supp. 198 (D.D.C.1967); Wills v. Trans World Airlines, Inc., 200 F.Supp. 360 (S.D.Cal.1961); C. McCormick, Damages § 81 (1935).

■ The liability of defendants Dixon, Martin and Towers for compensatory damages will, of course, be joint and several. Their liability for punitive damages will be on a different basis, however. The preferable rule, in this Court's judgment, is that each defendant's conduct may be independently eval-

uated in assessing punitive damages and that separate awards for such damages may be made against different defendants. See *e. g.*, Breeding v. Massey, 378 F.2d 171 (8th Cir. 1967); Ford Motor Credit Co. v. Hill, 245 F.Supp. 796 (W. D.Mo.1965) and cases collected in Annotation at 20 A.L.R.3d 648 (1968). While the current record provides no basis for distinguishing between the culpability of the various defendants and thus provides no basis for punitive damage awards of different amounts, separate awards nevertheless seem desirable. Punitive damages are imposed for their effect on the defendant and others similarly situated; the benefit which the plaintiff receives is incidental and, in a sense, a windfall. The risk of a judgment proof defendant is, accordingly, more appropriately placed on the plaintiff than the defendant who is first pursued in the execution process. The policy which the imposition of punitive damages is meant to foster will be best served if separate awards for punitive damages are made against defendants Dixon, Martin and Towers in the amount of Five Hundred Dollars in each instance.

Submit order.

## ON MOTION TO VACATE JUDGMENT

This is a civil rights action which has proceeded to final judgment. The plaintiff, a state prisoner, sought damages from prison personnel for personal injuries sustained in a systematic beating of inmates which followed a prison riot in September of 1971. Following a trial on the merits, this Court filed an Opinion and entered a judgment against three of the defendants, Towers, Martin and Dixon, on June 20, 1974. On July 9, 1974, these defendants moved, under Rules 59 and 60, for an order vacating the judgment and either granting a new trial or directing that a hearing be held to receive additional evidence. The grounds for the motion were (1) that the plaintiff and other inmates who testified in support of his case gave testimony at trial in conflict with testimony that they had previously given by way of depositions in another case, and (2) that "newly discovered" evidence clearly established that defendant Towers could not have been present at the time of the alleged beatings. On July 10, 1974, the Court denied the Rule 59 motion for a new trial as untimely filed and directed that defendants file a more specific statement of the grounds for relief under Rule 60. In the proceedings which have followed, defendant Towers filed a number of affidavits setting forth certain evidence which would be tendered if the judgment were vacated.

With respect to defendants' first ground, it is sufficient to observe that the Court has reviewed the deposition testimony to which it has been referred and has found nothing in significant conflict with the trial testimony which the Court credited in reaching the conclusions stated in its Opinion of June 20, 1974. The second ground for defendant Towers' motion requires more extended discussion, however.

In September of 1971 defendant Towers was the Assistant Director of Adult Corrections. At the trial, the plaintiff and at least one other inmate testified that they saw Towers strike the plaintiff. Other inmate testimony placed Towers at the scene of the beatings when they occurred. Officer Wolfe, an ex-guard, testified in support of the plaintiff's case that he had observed the systematic beating of inmates by numerous guards on the evening in question. These beatings occurred, according to Wolfe, in the maximum security building as the guards moved those believed to be the ring leaders of the riot to cells in the isolation section of the building. Wolfe was unable to say whether Towers was present at this time.

The Deputy Warden was also called by the plaintiff to testify. He stated that he arrived at the maximum security building about the time "the Governor came out of the building" and that "everything was just about over with

by the time . . . [he] got there." In the isolation section he found plaintiff and numerous other inmates in need of medical treatment and took them to the doctor. Plaintiff and three others were thereafter taken to a hospital for x-rays.

Towers testified in his own defense. He acknowledged being in the maximum security building after order had been restored, but denied that he had seen or been present at the beating of any inmate. He gave an account of his actions from the time he entered the building to quell the riot until he left the building to accompany the Governor from the maximum security area back to the administration building. Towers indicated that he had remained there the rest of the evening. In the course of so testifying, Towers gave estimated times when various events happened and suggested, based on his chronology of events, not only that he could not have been present at any beatings but also that the beatings could not have occurred. On cross-examination, Towers also indicated that he had never reprimanded a guard as a result of the events of that evening because he had never had any reason to believe beatings had occurred.

Another defendant, Captain Martin, also testified for the defense. In the course of his direct examination, he testified unequivocally that Towers was with him when the doors of the cell block were opened and the inmates transferred to isolation. Later, when his attention was directed to this testimony, he recanted, but only to a degree. He took the position that Towers "may have been there at the beginning [of the transfer to isolation], but he wasn't there during the whole process."

In its Opinion, the Court did not credit the inmate testimony that Towers had participated in the beatings. Neither did it credit Towers' testimony to the effect that the beatings could not have occurred or that, if they did, he was not present. The Court concluded:

Defendant Towers was a superior officer to both Dixon and Martin; while he did not strike . . . [the plaintiff], he was present at . . . [his] beating, had knowledge of it and acquiesced in it. This is sufficient to render him liable for the injuries sustained. . . .

The affidavits submitted in support of Towers' Rule 60(b) motion are intended to buttress his position that he could not have been present at the time of the beatings. An affidavit of the Governor, for example, confirms that Towers accompanied him when he left the maximum security area and went back to the administration building. Other affidavits place Towers in the administration building for a substantial period of time after this point. Taken alone, these affidavits are not particularly significant. The record testimony regarding time was understandably in some conflict and did not establish that the beatings could not have occurred prior to the time Towers went to the administration building. The testimony of the Deputy Warden, for example, can be taken to suggest a contrary conclusion.

Towers has also obtained an affidavit from Officer Wolfe, however, which, if accepted, would be of substantial significance in the overall context of this case. That affidavit states in part:

. . . Since there appeared to be no further need of my remaining in Pretrial and realizing that I was already late for my own shift, I left Pretrial and headed for the Medium Security Building. While enroute to Medium Security, I passed Governor Peterson and a party of those whom I believe were the prison administrators; that is, John Moran, Harry Towers, and perhaps the warden, who had just left Maximum Security and were headed in the direction of the Administration Building, the direction from which I had just come. Although I am certain that it was Governor Peterson that I passed, I can-

not swear to you those who were accompanying him since it was merely my impression that that's likely who was with him. After I had passed the Governor, I saw a guard looking in the window down at the end of Punishment Section in Maximum Security. Partly out of curiosity and thinking that perhaps there was some trouble in Maximum Security, I entered the main entrance of Maximum Security. There was still quite a bit of tear gas in the air and smoke which burned my eyes and caused them to tear. However, I remained in Maximum Security and observed the wholesale destruction of the interior of the building. I walked throughout most of Maximum Security Building just observing the destruction that had been done and speaking casually to some of the guards in the building. I do not recall how long I remained in the building, but it was during the time that I was in the building that I observed the beating of the inmates as they were transferred out of various cells. . . .

Officer Wolfe's testimony at trial was credited by the Court. It is fair to state that, if Officer Wolfe's testimony had placed the beatings at a point in time after the Governor's party had left the maximum security area, the Court's conclusion with respect to defendant Towers might have been different. It does not follow, however, that relief from judgment should be granted.

▇▇▇▇ Defendant Towers' motion must be evaluated in the context of the system of post-judgment relief set forth in the Federal Rules of Civil Procedure. Rule 59 provides that, upon motion made by a party within ten days after the entry of judgment, or upon the Court's own initiative within that period, a new trial may be ordered. The Court is powerless to extend this ten day period. F.R.Civ.P. 6(b). When Rule 59 is invoked in timely fashion, however, a new trial will be granted whenever, in the Court's judgment, that action is required to prevent injustice. The Court has broad discretion in making this determination. 11 Wright & Miller, Federal Practice & Procedure § 2805, p. 38.

▇▇▇ After the ten day period of Rule 59 has expired, relief from judgment must be granted, if at all, under Rule 60. Subsection (b) of that rule authorizes relief from judgment for five specific reasons set forth therein. One such reason is "(2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b)." Subsection (b) then goes on to authorize the vacation of a judgment for "(6) any other reason justifying relief from the operation of the judgment." A motion under Rule 60(b) must be made "within a reasonable time" and, if based on one of the first three reasons specified in the rule, must be made within a year of judgment.

▇▇▇ These provisions of Rules 59 and 60 must be construed together and must be applied in a manner which gives due recognition to the policy favoring the finality of judgments.

▇▇▇▇ As earlier noted, defendants did not file a timely motion under Rule 59 and the Court, accordingly, is without power to consider and act upon the present application under that rule. With respect to Rule 60(b), defendant Towers has offered no satisfactory explanation of why the information contained in his post-trial affidavits could not have been discovered prior to trial or within the time provided under Rule 59.[1] Relief under subdivision (2) of Rule 60(b) is, therefore, inappropriate.

---

1. Towers, of course, knew who he was with on the night in question and could have called those who have now given affidavits to testify at trial that he was in the administration building with the Governor during the latter portion of the evening. He also knew, at least as of the time of trial, that Officer Wolfe had viewed the beatings and presumably might know something about when they occurred.

■■■■■ This leaves for consideration the residuary clause of Rule 60(b)—subdivision 6, which refers to "any other reason justifying relief." This broad formulation may give the Court power adequate "to enable [it] to vacate judgments whenever such action is appropriate to accomplish justice", Black, J., in Klapprott v. United States, 355 U.S. 601, 615, 69 S.Ct. 384, 390, 93 L. Ed. 266 (1949), but the rule cannot be merely an alternative vehicle for obtaining a new trial or it would vitiate the provisions of Rules 59(b) and 6(b), which set a firm time limit on application for that remedy. Similarly, subdivision (6) cannot justify relief based solely upon "newly discovered evidence" which by due diligence *could* have been discovered by the time of trial, without rendering nugatory the explicit requirements of subdivision (2).[2] For these reasons, the application of subdivision (6) must be confined to truly "extraordinary, exceptional cases." Tann v. Service Distributors, Inc., 56 F.R.D. 593, 598 (E.D.Pa.1972), aff'd, 481 F.2d 1399 (3rd Cir. 1973); Torockio v. Chamberlain Mfg. Co., 56 F.R.D. 82, 87 (W.D. Pa.1972); aff'd, 474 F.2d 1340 (3rd Cir. 1973); 7 Moore's Federal Practice ¶ 60.27 [2].

Except for the shocking incident which gave rise to the complaint, the Court finds nothing extraordinary or exceptional about this case or the proceedings which led up to the final judgment. Suit was filed on March 7, 1973. Discovery was taken.[3] On January 18, 1974, plaintiff moved for trial; on February 6, 1974, the case was set for trial. Trial commenced on May 29, 1974, and the Court heard eighteen witnesses during the ensuing two and one-half days.[4]

At defendants' request the trial was then continued until June 6th to permit testimony from an additional witness who was convalescing from surgery during the trial. On June 20, 1974, the Court entered judgment imposing a joint and several liability of $1,500 on the three defendants and assessing punitive damages against each of them in the amount of $500.

■■■■ This is not a situation where the judgment under attack resulted from a procedural default. Nor is it a case in which a defense or some other relevant subject matter was not presented to the Court. The whereabouts of defendant Towers during the evening and the chronology of his movements were subjects upon which the trial focused. All that can be said is that Towers failed to call witnesses, known to him at the time of trial, who would have corroborated his own testimony in some respects, and failed to elicit in the cross-examination of a witness all that the witness knew about relevant subject matter. These circumstances alone, however, do not make this an extraordinary case appropriate for relief under Rule 60(b)(6). Almost every losing litigant can point to some corroborating witness he might have called or to some line of relevant questioning his attorney failed to exhaust on cross-examination.

Litigation must come to an end at some point. The parties to this case were given ample opportunity to place evidence before the Court. The Court carefully considered all of the evidence tendered, decided the controversy, and entered judgment. Finality of judgments rendered after trial of the merits is the general rule; relief from their op-

---

2. Subdivisions (1) to (5) and subdivision (6) of Rule 60(b) have been held to be mutually exclusive. FDIC v. Alker, 30 F.R.D. 527, 532 (E.D.Pa.1962), aff'd, 316 F.2d 236 (3rd Cir. 1963), cert. denied, 375 U.S. 880, 84 S.Ct. 150, 11 L.Ed.2d 111 (1963); 11 Wright & Miller, Federal Practice & Procedure § 2864 n. 39; 7 Moore's Federal Practice ¶ 60.27 [1].

3. The parties also had the benefit of an extensive investigation of the riot and its aftermath conducted by the Office of the Attorney General of Delaware in the Fall of 1971.

4. The trial transcript occupies 473 pages.

eration is the extraordinary exception. The granting of relief on the showing here made would replace the rule with the exception. Defendants' motion will be denied.