## DAISY A. HOOPER vs. HARRY O. BRAWNER.

*Master and Servant—Respondeat Superior—Loan of Servant—Surrender of Control—Automobile Accident.*

The rule of *respondeat superior* arises from the relation of principal and subordinate, and rests upon the power of control and direction which the superior has over the subordinate, and the responsibility of a master for the act of his servant depending upon that rule does not arise when the servant is not actually or constructively under the direction and control of the master.                                          p. 421

When the tortious act of a servant is during the general employment, but at a time when he has been loaned to another,

and the evidence affecting the relationship between the servant and borrower is vague or doubtful, it may be impossible to decide the question of the general employer's responsibility as a matter of law, this depending upon whether he or the borrower has the power to control and direct the servant.        p. 422

In order to rebut the presumption of the employer's responsibility, arising from the fact that the negligent act was done by his servant in the operation of an instrumentality owned by him, the employer must show that he had not, at the time of the accident, the right to control and direct the servant, and· this burden he does not meet by the bare statement that he had "loaned" the servant to another.        p. 430

To relieve the master from liability for the act of a servant loaned to another, it must appear from direct testimony, or as a necessary inference from the circumstances of the transaction, that the servant was, during the period of the loan, under the control of the borrower, and not under the control of the master.        p. 430

One who·loaned his automobile and chauffeur to another for the purpose of a drive, *held* not free, as a matter of law, from liability for the negligent act of the chauffeur, this being a question for the jury, as depending on whether he or the borrower had control of the chauffeur.        pp. 430-432

*Decided June 11th, 1925.*

Appeal from the Superior Court of Baltimore City (SOLTER, J.).

Action by Daisy H. Hooper against Harry O. Brawner. From a judgment for defendant, plaintiff appeals. Reversed.

The cause was argued before BOND, C. J., URNER, ADKINS, OFFUTT, PARKE, and WALSH, JJ.

*Charles C. Wallace* and *Edward H. Hammond,* with whom was *Wilton J. Lambert* on the brief, for the appellant.

*Edward L. Ward,* with whom was *Edwin W. Wells* on the brief, for the appellee.

OFFUTT, J., delivered the opinion of the Court.

Mrs. Daisy A. Hooper of Washington, D. C., was injured as a result of a collision, which occurred on the afternoon of June 17th, 1923, on the Frederick Road, near Cooksville, Maryland, between an automobile in which she was a passenger, and an automobile owned by Harry O. Brawner, of Baltimore, Maryland, and operated by his chauffeur, in which Mrs. Eleanor Brannan, the mother of Mr. Brawner's deceased wife, and her two nieces, the Misses Winsett, were riding at the time.

Mrs. Hooper claimed that the accident was caused by the negligence of the appellee's chauffeur, and demanded that Mr. Brawner compensate her for her injuries, which he declined to do. She thereupon brought this suit in the Superior Court of Baltimore City, where in due course it was tried before the court and a jury. At the conclusion of the whole case the jury was peremptorily instructed to find for the defendant, and from the judgment entered on the verdict returned in accordance with that instruction this appeal was taken.

The record contains two exceptions. The first was not pressed in this court and we are therefore only called upon to consider the second, which deals with the court's action on the prayers.

The defendant offered two prayers, both of which were granted. The first, the usual demurrer prayer, presented the proposition that there was no evidence in the case legally sufficient to entitle the plaintiff to recover. The evidence relating to the circumstances under which the accident occurred was conflicting, but as that prayer conceded the truth of all evidence tending to support the plaintiff's case, together with such inferences as might naturally and legitimately be drawn therefrom, and as there was some evidence in the case, which if true could have justified the inference that the accident was occasioned by the negligence of the appellee's chauffeur, the appellee did not rely upon that prayer in this court except in so far as it involved the proposition

presented by his second prayer, and it becomes unnecessary to refer further to it, or the facts and circumstances surrounding the actual happening of the accident.

The real question in the case is raised by the defendant's second prayer. By it the jury were told "that as it appears from the uncontradicted evidence in this case that the automobile of the defendant was loaned by him on the occasion in question together with the driver thereof to Mrs. Brannan for her personal pleasure and use and that at the time of the accident in question said automobile was being operated solely for her pleasure and benefit, and that the defendant had no control or direction over said automobile, their verdict must be in favor of the defendant." It is based upon the testimony of Mrs. Eleanor Brannan, which is the only evidence found in the record upon the question of whether at the time the accident occurred the appellee was answerable for the negligence of the chauffeur operating his automobile. Mrs. Brannan, in reference to that question, testified that on the afternoon of June 17th, 1923, Mr. Brawner "loaned" her his "car and chauffeur," and that she and her two nieces, the Misses Winsett, went out for a ride; that they were living at the Geneva Apartments, and that Mr. Brawner lived at the Baltimore Country Club; that they borrowed the car at about three o'clock in the afternoon, and that Mr. Brawner did not come in the car nor did he accompany them; that they "just took a ride" out the Frederick Road; that she did not go out that road herself, that she did not know why he went out that road, that she did not like the class of people who go out that way on Sundays; that they went as far as Lisbon and were returning at the time of the accident; that she had frequently borrowed the car from Mr. Brawner, who is her son-in-law, the husband of her deceased daughter, and that whenever she wanted the car he loaned it to her; that the trip was for pleasure and that Mr. Brawner had no interest in it, and that Mr. Brawner employed and paid the chauffeur.

The appellant contends that that evidence is not sufficient

to destroy the *prima facie* presumption of the defendant's liability which arose from the fact that at the time the accident occurred the chauffeur operating the appellee's car was in his general employment. The appellee on the other hand contends that it raises the conclusive presumption that, although the chauffeur was in his general employment, yet since he and the car which he operated had been loaned to Mrs. Brannan, they were not at the time of the accident under the control of the defendant, but under the control of Mrs. Brannan, and that Mr. Brawner is not therefore answerable for any default or negligence of his chauffeur during the continuance of that relationship. These conflicting contentions present the real issue in the case. The rule of *respondeat superior* arises from the relation of principal and subordinate, and rests upon the power of control and direction which the superior has over the subordinate, and the responsibility of a master for the act of his servant depending upon that rule does not arise when the servant is not actually or constructively under the direction and control of the master. Conversely that responsibility does exist whenever a third person is injured by some act or omission of the servant, within the scope of his employment, over whom the master had the power of control and direction, actual or constructive, at the time of such act or omission. While these principles are generally accepted, their application varies in different jurisdictions in accordance with varying interpretations placed on the terms "master and servant" and "within the scope of his employment."

In cases where the tortious act is done in the direct course of the employment and at the master's direction express or implied there is little difficulty. But when the act is done by the servant during the continuance of the general employment but at a time when he has been loaned to another, the application of the rule *respondeat superior* is more difficult and where the evidence affecting the relationship between the servant and the borrower is vague or doubtful it may become impossible to decide the question of the responsibil-

ity of the general employer as a matter of law, for in such cases the responsibility of the master, according to the weight of authority, depends upon whether he or the borrower has the power to control and direct the servant at the time of the tortious act. And that conclusion appears to be consistent with common sense and sound reason, for since the responsibility of the master depends upon his power to control and direct the acts of his servant, if he has surrendered that power to another, the reason for his responsibility ceases, and it would be unreasonable to hold him responsible for the acts of one whom he had not the power to control or direct, merely because the tort feasor was in his general employ. His responsibility does not grow so much out of the relation of master and servant as out of the power of direction and control which are usually incident to that relation.

While these principles are, we think, established, there has been some conflict in the manner of applying them to cases similar in character to this. The difficulty grows out of the anomalous character of the relationship between the master of a servant loaned to another, and the servant, and between the servant thus loaned and the borrower, for in such cases it may happen that the master who hires, pays and discharges the servant has not the power to control or direct him, while the person who has the power to control and direct him has not the power to hire or discharge him, and does not pay him.

The inherent difficulty of formulating a rational rule for applying the principle of *respondeat superior* to such facts as are involved in this case is illustrated by the case of *Laugher v. Pointer,* 5 B. & C. 547, which was heard in the Court of King's Bench in 1826. In that case the owner of a carriage hired of a liveryman a pair of horses to draw it for a day, and the owner of the horses provided a driver, through whose negligence the property of a third person was damaged. The case was argued before all of the twelve judges, except the Lord Chief Baron, in Sergeant's Inn, on a rule to set aside a nonsuit. The twelve being unable to

agree, the case was disposed of in the Court of King's Bench by four judges who divided evenly on the question, and the rule was discharged. The opinions of these judges exhausted both the reasoning and the then existing precedents and learning upon the subject.

Littledale, J., in support of the proposition that the master was not liable, said: "For the acts of a man's domestic servants there is no doubt but the law makes him responsible, and if this accident had been occasioned by a coachman who constituted a part of the defendant's own family, there would be no doubt of the defendant's liability; and the reason is, that he is hired by the master either personally or by those who are entrusted by the master with the hiring of servants, and he is therefore selected by the master to do the business required of him. This rule applies not only to domestic servants who may have the care of carriages, horses and other things in the employ of the family, but extends to other servants whom the master or owner selects and appoints to do any work or superintend any business, although such servants be not in the immediate employ or under the superintendence of the master." * * * "The cases referred to before Lord Ellenborough only shew, indeed, the owner of the horses to be liable, but it may be said the traveller is liable also. I think not. The coachman or postillion cannot be the servant of both. He is the servant of one or the other, but not the servant of one and the other; the law does not recognize a several liability in two principals who are unconnected. If they are jointly liable you may sue either, but you cannot have two separately liable; you must bring your action either against the principal, or the person who commits the injury."

And to the same end Abbott, C. J., said: "I am sensible of the difficulty of drawing any precise or definite line as to time or distance. But I must own that I cannot perceive any substantial difference between hiring a pair of horses to draw my carriage about London for a day, and hiring them to draw it for a stage on the road I am travel-

ling, the driver being in both cases furnished by the owner of the horses in the usual way; nor can I feel any substantial difference between hiring the horses to draw my own carriage on these occasions, and hiring a carriage with them of their owner. If the hirer be answerable in the present case, I would ask on what principle can it be said that he shall not be answerable, if he hires for an hour or for a mile? He has the use and benefit *pro tempore,* not less in the one case than in the other. If the hirer is to be answerable when he hires the horses only, why should he not be answerable if he hires the carriage with them? He has the equal use and benefit of the horses in both cases, and has not the conduct or management of them more in the one case than in the other. If the temporary use and benefit of the horses will make the hirer answerable, and there be no reasonable distinction between hiring them with or without a carriage, must not the person who hires a hackney coach to take him for a mile, or other greater or less distance, or for an hour, or longer time, be answerable for the conduct of the coachman? Must not the person who hires a wherry on the Thames be answerable for the conduct of the waterman? I believe the common sense of all men would be shocked if any one would affirm the hirer to be answerable in either of these cases."

Taking the opposite view, Holroyd, J., dissenting, stated what has unquestionably come to be regarded by the weight of authority in this country as the sounder rule. He said: "But in the present case, although the horses were continued in the custody of a driver provided by Bryant, yet as the horses and the driver were to be for the use and subject to the general directions of the defendant, and as the defendant had a right to retain them till the time for which they were hired was expired, and as they were at the time the mischief was done in the use and under the directions of the defendant, I think that the driver was for this purpose in the employ, and in law, the servant of the defendant, and that the defendant was in law answerable for the driver's

negligence in the execution of the defendant's orders in such employ, in whatever situation the driver might also stand with respect to Bryant, with regard to Bryant's responsibility for him, at the election of the plaintiff. A person may stand in the relation of servant to two different persons as his masters in two different respects with regard to the same thing, and this even though the service done, or to be done, be special and limited to a single act, as appears in 2 *Rolle's Abr.* 556, pl. 14."

And Bayley, J., in support of the same view said: "Had the defendant hired the driver, can there be a doubt but that he would have been the defendant's servant? If he leaves it to the owner of the horses to hire him, is he not, in substance, hired by the defendant? If I hire horses of A. and hire B. to drive, B. is undoubtedly, for the time, my servant. Is the driver less my servant for the time, because I hire him and the horses under one bargain, and allow the owner of the horses to select him? He is employed for me; that cannot be disputed. He drives where I direct, and so as I require nothing contrary to my contract with the owner of the horses, he must obey my reasonable commands. He must go where I order; must stop where I require; must go the pace I specify. Though the owner of the horses is, to a certain extent, his master, I am, to a certain extent, his master also. Though the former is his master in general, he has, for a time, let him out to me; and a master is liable for the acts of one who is in his service or employ, though the master who is to be charged is not his immediate employer, but employs him through the medium of another. If I hire the driver, I am answerable for him, if I employ J. S. to hire him, am I not still answerable? I exercise my own judgment in the one case, I leave it to J. S. to exercise a judgment for me in the other, but still it is for me that the judgment is exercised. The service is performed for me. It is my work the driver does."

The question was not regarded as settled by that case, but in *Quarman v. Bennett,* 6 M. & W. 499, Parke, B., in deal-

ing with a case in which the owners of a carriage were in
the habit of hiring horses to draw it, and the owner of the
horses provided a driver through whose negligence a third
person was injured, adopted the views of Littledale and
Abbott, JJ., in *Laugher v. Pointer* and held that the owner
of the carriage was not responsible. That conclusion was not
final either, and in *Rourke v. White Moss Colliery Company,*
2 C. P. D. 205, it was modified at least to some extent. In
that case the owner of a colliery employed a contractor to
sink a shaft in a coal mine, and agreed to furnish him with
an engine and a man to run it, whose wages were to be paid
by the owner but who was to be subject to the control and
direction of the contractor. In that case the contractor was
held liable for the consequences of the negligence of the man
operating the engine.

In *Jones v. Scullard* (1898), 2 Q. B. 565, after analyzing
the earlier cases, Lord Russell, C. J., said: "Now apply the
principles of those cases to the facts of the case before me.
What control had the livery stable keeper over the driver
while driving the defendant's horse? Absolutely none. The·
whole control was in the defendant, who could have ordered
the driver to go fast or slow, or stop or go on, just as he
pleased, or to keep the horse without food, or otherwise
manage the horse as he directed. * * * And in such a case,
especially if, as here, the driver has driven the hirer for a
considerable period of time and been approved by him, and
the horse is one the characteristics or peculiarities of which
neither the livery stable keeper nor his driver have had any
practical opportunity of becoming acquainted with, there is,
it seems to me, evidence upon which a jury would be justi-
fied in coming to the conclusion that the driver was upon
the occasion in question acting as the servant, not of the
livery stable keeper, but of the person who hired him."
And in *Halsbury's Laws of England,* vol. 20, p. 267, the
general rule deduced from these cases is thus stated: "In
accordance with the same principle, a servant who is lent
by his master to a third person for the purpose of being

employed in a particular way is to be deemed whilst thus
employed the servant of the person to whom he is lent,
though for other purposes he remains the servant of his
master. Such person will therefore be liable for torts com-
mitted by the servant in the course of his particular employ-
ment, provided that the servant is at the time when they are
committed subject to his control and not to that of the mas-
ter. His liability is, it seems, the same whether the lending
is gratuitous or for reward."

*Laugher v. Pointer, supra,* and *Quarman v. Bennett,
supra,* were referred to by this Court in *Deford v. State, use
of Keyser,* 30 Md. 201 etc., where it was dealing with the
responsibility of an owner of property, who had employed a
contractor on a commission to construct a building, for an
injury occasioned to a third person through the negligence
of servants who, while paid by the owner, were under the
control and direction of the contractor and persons employed
by him. In dealing with the application of the rule of *re-
spondeat superior* to the facts of that case it was said: "The
greatest difficulty, however, in these cases is in determining,
upon the facts, who is to be regarded as the master of the
wrongdoer. This of course depends mainly upon the terms
and character of the contract of employment. And whether,
in the case before us, the parties engaged in the erection of
the wall that fell, were the servants of Deford, depends upon
the control and direction that he could rightfully exercise
over them. If they were at his command and bound to obey
his orders and direction, in regard to the work they were
engaged in, and could be, at any time he thought proper, dis-
charged by him, then they were his servants, and he is lia-
ble for the consequences of their negligence and malfeasance
committed in the course of their employment. But if, on the
other hand, they were at work or directing the work on the
building, as independent contractors or the servants and
employees of independent contractors, over whom he could
rightfully exercise no such control and direction, he is not
so liable. The terms and manner of employment were, of

course, matters of fact for the jury; it being for the court to declare the legal relation that existed between the parties, upon any given state of facts."

In *Sacker v. Waddell,* 98 Md. 44, the facts were these: Columbus Waddell loaned to Samuel Johnson a horse, wagon and a driver, his son Frederick Waddell, to assist Johnson in threshing wheat. A man named Gambrill, in charge of the work for Johnson, called to Frederick to come to him, and in driving to him in obedience to that order he ran over Claude Sacker and injured him. The question was whether Frederick was the servant of Johnson, or of Columbus Waddell, his father, at the time of the accident. In considering that question this Court, through Judge Boyd, said: "When the facts are such as to make it doubtful whether the relation between the servant and the original master continued for the particular service during which the accident happened, it is usually a question for the jury to determine."

The same question was before the court in the late case of *Amer. Sug. Ref. Co. v. Gilbert,* 145 Md. 251, where the negligence of an electrician loaned to the defendant by a contractor injured a third person, and the rule stated in *Sacker v. Waddell* was again approved, and it was there held that because the evidence was not sufficiently "clear and convincing" to enable the court to say, as a matter of law, that the electrician was the servant of the defendant at the time of the injury that the question was one for a jury.

The latest expression of this Court on the question is found in *Salowitch v. Kres,* 147 Md. 23. The facts in that case were these: Louis Salowitch a dealer in auto parts and used automobiles, according to the plaintiff's testimony, loaned an automobile truck and a driver to his father who was engaged in the grocery business. Murphy, the driver, had no operator's license and had not been theretofore employed as a driver but as a mechanic or laborer. He had been engaged in delivering groceries for the defendant's father, and was returning to "Mr. Salowitch's place" when the plaintiff's truck was damaged by the negligent operation of Salowitch's

truck by Murphy. In dealing with the responsibility of Louis Salowitch for Murphy's negligence, this Court, speaking through Judge Digges, said: "Whether or not the evidence, as disclosed by the record, is of such a character as will overcome the presumption, is a question of law for the court. * * * It is uncontradicted that the business of the appellant was dealing in auto parts and buying, repairing and selling second-hand motor trucks, and that it was no part of Murphy's general duties, as the servant of the appellant, to drive motor trucks; therefore, if the evidence of the plaintiff is believed, when the appellant loaned the truck and driver to his father, the servant was in the special service of another, engaged in that other's business and subject to his control and direction. Murphy thus temporarily became the servant of some one other than the appellant, and was such other's servant at the time of the accident. This being true, the defendant was not liable for injuries resulting from such accident."

There was no attempt in that case to modify in any way the principles established by the earlier cases to which we have referred, but the conclusion reached in it was based solely upon the finding that the plaintiff's uncontradicted evidence showed that at the time the accident occurred Murphy was under the control and direction of the defendant's father, and not under the control and direction of the defendant, and it cannot be considered as establishing the principle that the mere statement that a servant had been loaned by his master to another without any explanation of the circumstances of the loan creates a presumption of law that he is under the control and direction of the borrower. Prior to that case, where it appeared that an injury was caused by some instrumentality possessed by the person sought to be held and operated by his servant, there arose a presumption that at the time of the accident the servant was engaged within the scope of his employment in the master's business. The master could rebut that presumption by showing either that the servant had deviated from his employment, or that

he was under the control, and direction of some person other than his master, to whom he had been loaned, and was not at the time of the accident under the control and direction of his general employer. That is, it was incumbent upon the defendant, in order to break down the presumption that he was responsible, arising from the fact that the negligent act was done by his servant in the operation of an instrumentality owned by him, to show affirmatively as a matter of fact that he had not at the time of the accident the right to control or direct the servant, and we do not think it can be conclusively said as a matter of law that he has met that burden by the bare statement that he had "loaned" the servant to another. He must go further and show that when he loaned him he surrendered to the borrower the right to control and direct him.

Applying these principles to the facts of this case, we cannot say as a matter of law that at the time of the accident the chauffeur in charge of the defendant's car was under the exclusive control and direction of Mrs. Brannan, or that he was not under the control and direction of the defendant; nor upon those facts can it be said as a matter of law that if the accident was caused by the negligent act of the defendant's chauffeur that he would not be liable therefor.

The mere use of the word "loan" or "borrow" does not in itself necessarily carry the implication that the master surrendered all control over the servant during the period for which he had been loaned. To relieve the master from liability for the act of a servant loaned to another, it is necessary that it should appear from direct testimony or as a necessary inference from the circumstances of the transaction that the servant was during the period of the loan under the control of the borrower and not under the control of the master.

If one should lend his automobile and chauffeur to drive a guest to a railroad station or to a friend for a sightseeing drive of a few hours it would be absurd to say that the borrower, if he had no right to control the movements of the

chauffeur beyond suggesting the things he would like to see
or the places he would prefer to go to, should be responsible
for his actions.    It certainly would be unreasonable to hold
a guest responsible for the operation of an automobile of
which he may have known nothing, by a chauffeur whom he
had not employed and of whose qualifications he was ignor-
ant, and whom he had not the power to direct or control.    It
certainly has not been supposed that, when one accepted the
loan of an automobile under such conditions, that he became
liable for the misconduct of the driver or the defects in the
automobile which he used, and if such were the law there
are few who would not hesitate to accept a courtesy accom-
panied by such risks.    On the other hand where, as in the
case of *Salowitch v. Kres,* the automobile and the chauffeur
were loaned to the borrower to be used under his direction,
in his business, and at his discretion, it would be equally un-
reasonable and illogical to hold the general employer liable
for the acts of his servants in the performance of a duty
which had been ordered and directed by the borrower, and
which the general employer had not the power either to di-
rect, control or prevent.

In this case the only testimony bearing upon this question
is to the effect that Mr. Brawner loaned his car and chauf-
feur to Mrs. Brannan for a drive, and that without any di-
rection at all from her and contrary to her wishes the chauf-
feur drove out the Frederick Road.    It may be inferred from
that general testimony that he did that without suggestion
from any one, or that it was suggested by one of the Misses
Winsett, or that it was directed by Mr. Brawner, but it cer-
tainly cannot be assumed as a matter of law that it proves
that he did it at the direction of Mrs. Brannan, or that he
was under her direction at all when her flat statement is that
she did not know why he went out that way, and that she
did not like that route.    It could be inferred from that evi-
dence that Mr. Brawner did surrender control and direction
of the servant to Mrs. Brannan, and that she left the matter
of a route to the chauffeur, and if that was so then she and

not Brawner was responsible for his acts. But that is an inference of fact which should be passed on by a jury and not a conclusion of law which should be drawn by the court as from conceded or established facts admitting but one inference.

For these reasons there was in our opinion error in granting the defendant's first and second prayers, withdrawing the case from the jury, and it will be necessary therefore to reverse the judgment appealed from.

> *Judgment reversed with costs, and case remanded for a new trial.*