JAMES EMBREY, JR. ET AL. *v.* DENNIS P. HOLLY

[No. 71, September Term, 1981.]

*Decided March 23, 1982.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, COLE, DAVIDSON and RODOWSKY, JJ.

*Theodore Sherbow,* with whom were *Stephen M. Hearne* and *Sherbow, Shea & Tatelbaum, P.A.* on the brief, for appellants.

*Marvin Ellin* and *Donald F. Oakley,* with whom were *Ellin & Baker* on the brief, for appellee.

DIGGES, J., delivered the opinion of the Court. MURPHY, C. J., and ELDRIDGE and DAVIDSON, JJ., dissent. MURPHY, C. J., filed a dissenting opinion at page 143 *infra,* in which ELDRIDGE and DAVIDSON, JJ., join.

Ever since the United States Supreme Court in the case of *New York Times v. Sullivan* [1] declared in 1964 that laws of libel and slander are incompatible with the concepts underlying the first amendment of the federal constitution, courts have struggled to strike a proper balance between the

1. 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

interest of an individual in guarding his reputation [2] and the federally protected free speech values that in many ways represent the essence of our democratic society. With this case, we shall join the fray and determine whether an employer may be held liable for punitive damages imposed for the defamatory utterances of an employee. We shall also decide whether it was appropriate for the trial court to have permitted the jury in this case to award separate and varying amounts of punitive damages against multiple defendants. But first, we introduce the parties and set forth the factual background of this litigation.

Respondent Dennis Holly, a television news commentator in Baltimore, instituted this defamation action against petitioners James Embrey, Jr., a local radio show host known professionally as Johnny Walker, and Walker's employer, Baltimore Radio Show, Incorporated, the operator of radio station WFBR. By the suit, Holly seeks recompense for damage to his reputation resulting from a purported joke about the newsman which Walker related during his morning radio program in February, 1979. It seems that Walker specializes in what one listener and witness characterized as "a zany, whacky, crazy, fanciful morning disc jockey show with some added features, such as the Little News in the Morning where Johnny writes crazy and wild things about current events and makes up a whole lot of things that haven't

---

**2.** A person's good name has been described as being even more deserving of protection than his property. Shakespeare noted that

Good name in man and woman, dear my lord,
Is the immediate jewel of their souls;
Who steals my purse steals trash; 'tis something, nothing;
'Twas mine, 'tis his, and has been slave to thousands;
But he that filches from me my good name
Robs me of that which not enriches him,
And makes me poor indeed.

"Othello," Act 3, Scene 3, 1.155. And as Justice Stewart put it:

The right of a man to the protection of his own reputation from unjustified invasion and wrongful hurt reflects no more than our basic concept of the essential worth of every human being — a concept at the root of any decent system of ordered liberty.

Rosenblatt v. Baer, 383 U.S. 75, 92, 86 S.Ct. 669, 679, 15 L.Ed.2d 597 (1966) (concurring opinion).

happened, but sound like they are news items. . . ." As another regular part of Walker's show, Ron Matz, a WFBR newsman, would call Walker from another telephone in the station and impersonate the character of "Harry Horni," a gossip columnist calling from a phone booth in Hollywood, California, with "tidbits" of information concerning Hollywood, national, and on occasion, local personalities. Testimony indicates that the "tidbits" represented a mix of fact with fiction, and that Walker and Matz would engage in an *ad lib* dialogue in which Walker would attempt to fashion humorous responses to "Horni's" revelations. The "Horni Report," like all of Walker's material, was punctuated with various sounds of laughter, cheering, applause, and the like which the broadcaster actuated by playing numerous pre-recorded cartridges.[3]

Walker's comment which spawned this defamation litigation occurred during the "Harry Horni" segment of his show on the morning of February 28, 1979, about a week after Baltimore had been paralyzed by a blizzard which left the city buried under two feet of snow. During the "Horni Report" taped at 6:15 a.m., the fictitious columnist truthfully related that Dennis Holly was about to undergo knee surgery. Apparently believing that the "Horni" section of his show, which was re-broadcast at 8:15 a.m., lacked sufficient "humor," Walker, as the subsequent airing of the "tidbits" was ending, added an additional comment about Holly: "Too bad about Dennis Holly, though. Hope that comes out okay. Wonder how he hurt his knee? Probably fell down carrying that TV during the blizzard last week, right?"[4] It was the unique context of Walker's comment that transformed this seemingly innocuous statement into one the jury determined to be libelous, for during the

---

**3.** He explained at trial that there are "about one hundred sound effects and goofy things that I use."

**4.** As the tape of the offending broadcast was not preserved, there is no documentation of the exact words used. After suit had been filed, however, Walker and Matz reenacted to the best of their recollection the "Horni" broadcast containing the just quoted words. This reenactment was recorded on tape, and, at the instance of Walker and the radio station, was received into evidence and played for the jury.

blizzard, groups of so-called looters, taking advantage of immobilized police vehicles, broke into scores of commercial establishments in the Pennsylvania Avenue area of Baltimore and virtually stripped them of all merchandise.[5] Certain of Walker's listeners did not recognize the "humor" in the radio host's words about Holly, for the switchboard operator at WMAR-TV, where Holly was employed, told the jury that she received numerous inquiries concerning the truth of Walker's remark. Similarly, Holly, who is black, began receiving anonymous, harassing phone calls. One caller is quoted by the newscaster as having said: "You pushed George Rogers out of his job and now you have stolen a television set and you are getting what you deserve. . . . All you niggers are thieves." Thus, failing to appreciate Walker's "humorous" aside, Holly sued the radio host and his employer for defamation. A jury in the Baltimore City Court found that the disc jockey's comments were libelous and awarded Holly $25,000 in compensatory damages against both defendants; in addition, the jury awarded punitive damages of $5,000 against Walker and $35,000 against his employer, Baltimore Radio Show, Inc. The Court of Special Appeals, while affirming the judgment, vacated it as to the punitive award and ordered a new trial on the issue of exemplary damages after determining on its own motion that it was improper to permit the jury to grant such damages in differing amounts against the two defendants.

The petitioners in this Court, Walker and Baltimore Radio Show, Inc., being limited by the terms of our grant of certiorari to the punitive damages aspect of this case, present two

---

**5.** For a detailed analysis by the Court of Special Appeals of the factual context and innuendo which, in its opinion, justified submission of the defamation issue to the jury see Embrey v. Holly, 48 Md. App. 571, 587, 429 A.2d 251, 262 (1981), where the Court determined in this case that "[t]he evidence, tested by the clear and convincing standard, was such as to allow the jury to conclude reasonably that Walker's remark" was libelous. The intermediate court also decided that "the evidence perspicuously supports the jury's finding that Walker acted with a high awareness that the 'joke' relative to Holly could be perceived as true;" consequently, as the radio host's conduct met the *New York Times* standard, punitive damages were properly awarded in this case. Id. at 594, 429 A.2d at 265-66. Neither of these determinations was encompassed within our grant of certiorari in this action; accordingly, we express no opinion as to their correctness and do not consider them further here.

issues. They claim first that allowing such damages against the radio station's corporate owner on the sole basis of *respondeat superior* violates the first amendment, as interpreted by recent United States Supreme Court decisions, by impermissibly imposing a form of liability without fault in a defamation case. Next, the petitioners assert that the trial court correctly permitted the jury to apportion punitive damages between Walker and his employer, and therefore the intermediate appellate court erred when it reversed the trial judge in this regard. As we find no infirmity with the punitive award against the employer, and we determine that it is proper for a trial court to allow the jury to apportion punitive damages between multiple wrongdoers, the judgment of the Court of Special Appeals will be partially reversed. We first address the *respondeat superior* issue.

Following a lengthy analysis of federal first amendment free speech values, in contradistinction to the states' interest in protecting their citizens from defamatory utterances, the United States Supreme Court in *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 347, 94 S.Ct. 2997, 3010, 41 L.Ed.2d 789 (1974), held that "so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual." Seizing upon this language, the petitioners assert that "[v]icarious liability of a principal for punitive damages in a defamation case based solely on the existence of an employer-employee relationship is a form of strict liability that violates the constitutional principles established in *Gertz.*" Alternatively, in the absence of constitutional mandate but in light of the policy of free expression inherent in the first amendment, we are urged to require some degree of active employer complicity in the defamatory acts of its employee before liability for punitive damages can attach to the master in a defamation case. In order to discuss properly petitioners' intertwined claims in this regard, we must examine the basis of an employer's responsibility for its employee's torts and the nature of punitive damages in this context.

We begin by noting that it is hornbook law that an employer is ordinarily responsible for the tortious conduct of his employee committed while the servant was acting within the scope of the employment relationship. This rule of *respondeat superior* arises from the relation of principal and subordinate, "and rests upon the power of control and direction which the superior has over the subordinate. . . ." *Hooper v. Brawner,* 148 Md. 417, 421, 129 A. 672, 674 (1925). Although the master's liability for compensatory damages in the usual case is beyond question, it is far from universally accepted that the master can, on similar principles, be held responsible in punitive damages for its employee's tortious acts. A majority of courts have adopted the rule that if the servant has committed a tort within the scope of his employment so as to render the employer liable for compensatory damages, then the master may likewise be liable for punitive damages if the servant's act is such as to properly occasion such liability; [6] and this is equally true where the employer is a corporation.[7] However, a substantial minority of courts declare that an employer may not be held vicariously liable for punitive damages unless it either authorizes, participates in, or ratifies the employee conduct giving rise to such damages.[8] This century old controversy over

---

**6.** E.g., Western Coach Corp. v. Vaughn, 9 Ariz. App. 336, 452 P.2d 117, 119 (1969); Standard Oil Co. of Kentucky v. Gunn, 234 Ala. 598, 176 So. 332, 334 (1937); Miller v. Blanton, 213 Ark. 246, 210 S.W.2d 293, 296 (1948); Mercury Motor Express, Inc. v. Smith, 372 So.2d 116, 117 (Fla. App. 1979); Amer. Fidelity & Cas. Co. v. Farmer, 48 S.E.2d 122, 131-32 (Ga. App. 1948); State Bank of Waterloo v. Potosi Tie & Lumber Co., 299 Ill. App. 524, 20 N.E.2d 893, 895 (1939); Northrop v. Miles Homes, Inc. of Iowa, 204 N.W.2d 850, 858-59 (Iowa 1973); Goddard v. Grand Trunk Ry., 57 Maine 202, 223-24 (1869); D.L. Fair Lumber Co. v. Weems, 196 Miss. 201, 16 So.2d 770, 773 (1944); Rinker v. Ford Motor Co., 567 S.W.2d 655, 669 (Mo. App. 1978); Schmidt v. Minor, 150 Minn. 236, 184 N.W. 964, 965-66 (1921); Clemmons v. Life Ins. Co. of Georgia, 274 N.C. 416, 163 S.E.2d 761, 767 (1968); Kurn v. Radencic, 141 P.2d 580, 581 (Okla. 1943); Stroud v. Denny's Restaurant, Inc., 271 Or. 430, 532 P.2d 790, 794 (1975); Odom v. Gray, 508 S.W.2d 526, 533 (Tenn. 1974). *See generally,* 22 Am.Jur.2d *Damages,* §§. 257-261; 10 Fletcher Cyc. Corps. (perm. Ed.) § 4906; W. Prosser, *Law of Torts* (4th ed.), § 2, at p. 12.

**7.** Liability of a *municipal* corporation for punitive damages, however, presents an entirely different question than the one discussed in the text, and we do not consider such liability here.

**8.** E.g., Lake Shore R. Co. v. Prentice, 147 U.S. 101, 13 S.Ct. 261, 263, 37 L.Ed. 97 (1893); Hartman v. Shell Oil Co., 68 Cal.App.3d 240, 137 Cal.

punishment of the master or other principal by levying punitive damages on him for the acts of the agent rests ultimately upon philosophical grounds. Some cases represent the position that an arguably "non-culpable" employer should not be punished for acts which it did not to some degree "commit"; others view the imposition of exemplary damages on the master as merely injecting an additional factor into the cost-benefit calculations of companies who might otherwise find it economically prudent to disregard the threat of liability or to fail to exercise closer control over their employees. The decisions of this Court, while not discussing the question in light of the first amendment considerations raised here, have on numerous occasions sided with those which vicariously impose punitive damages on the master for acts of the servant committed during the course of his employment without regard to whether the master authorized, participated in, or ratified the employee's conduct. See *Safeway Stores, Inc. v. Barrack,* 210 Md. 168, 176-77, 122 A.2d 457, 461-62 (1955); *Boyer & Co. v. Coxen,* 92 Md. 366, 368, 48 A. 161, 162 (1901); *Balt. & Yorktown Turn. v. Boone,* 45 Md. 344, 354-56 (1876); *B & O, R.R. Co. v. Blocher,* 27 Md. 277, 286 (1867). As was noted by our predecessors in *Boyer & Co. v. Coxen, supra* at 368, 48 A. at 162:

> Although the rule [holding the principal liable for punitive damages] may in some cases result in hardship to the principal, yet, if carefully applied, there is less danger of injustice in enforcing it, in proper cases, than in denying it in all cases unless the principal has actually participated in the wrong

Reptr. 244, 249 (1977); Remeikis v. Boss & Phelps, Inc., 419 A.2d 986, 992 (D.C. App. 1980); Barlow v. International Harvester Co., 95 Idaho 881, 522 P.2d 1102, 1118-19 (1974); Couillard v. Bank of New Mexico, 89 N.M. 179, 548 P.2d 459, 463-64 (1976); Roginsky v. Richardson-Merrell, Inc., 378 F.2d 832 (2nd Cir. 1967) (New York Law); Rickbeil v. Grafton Deaconess Hospital, 74 N.D. 525, 23 N.W.2d 247, 260-61 (1946); Gray v. Allison Div., General Motors Corp., 52 Ohio App.2d 348, 370 N.E.2d 747, 752 (1977); Gulf, C. & S.F. Ry. Co. v. Reed, 80 Tex. 362, 15 S.W. 1105 (1891); Shortle v. Central Vermont Pub. Serv. Corp., 399 A.2d 517, 518 (Vt. 1979); Freeman v. Sproles, 204 Va. 353, 131 S.E.2d 410, 414 (1963); Rueping v. Chi. & N.W. Ry. Co., 116 Wis. 625, 93 N.W. 843, 845 (1903).

> done by his agent or servant or authorized or ratified it. *Any* liability of the master for a tort of his servant is dependent upon the fact that the servant was acting at the time in the course of his master's service, and for his benefit, within the scope of his employment. The master selects him for that service and knows, or ought to know, what sort of a person he is investing with authority to act for him. The servant is acting for his master when the wrong is done — it is in contemplation of law the act of the master. In a great many cases, a judgment against the servant would be of no value to the injured one and no punishment to the wrong-doer, as it could not be collected. Every character of business, of any considerable proportions, is for the most part conducted through agents and servants, and if the principal or master cannot be held responsible in punitive damages, it would in many, perhaps in most actions of torts, be equivalent to abolishing that character of damages, if he is to be relieved by reason of the fact that the act complained of was done by the servant, and not by him individually.

It is thus apparent that, in this State, the tortious act of the servant done in the course of his employment is ordinarily the legal act of the master, and in this sense, the employer is not free of "fault." *See James v. Prince George's County,* 288 Md. 315, 332, 418 A.2d 1173, 1182 (1980). Moreover, as a corporation can only act through its agents, logic would dictate that the "fault" of the agent be imputed to the corporation for purposes of determining responsibility for a wrongful act in order to render the punitive damage mechanism at all effective to bolster the institutional decency of the corporate defendant. The "classic diatribe" [9] to this effect is found in *Goddard v. Grand Trunk Ry.,* 57 Me. 202, 223-24 (1869), which, in its eloquence, merits quoting at length.

---

**9.** W. Prosser, *The Law of Torts* (4th Ed.), § 2, p. 12, n. 95.

We confess that it seems to us that there is no class of cases where the doctrine of exemplary damages can be more beneficially applied than to . . . corporations . . . and it might as well not be applied to them at all as to limit its application to cases where the servant is directly or impliedly commanded by the [railroad] corporation to maltreat and insult a passenger, or to cases where such an act is directly or impliedly ratified; for no such cases will ever occur. A corporation is an imaginary being. It has no mind but the mind of its servants; it has no voice but the voice of its servants; and it has no hands with which to act but the hands of its servants. All its schemes of mischief, as well as its schemes of public enterprise, are conceived by human minds and executed by human hands; and these minds and hands are its servants' minds and hands. All attempts, therefore, to distinguish between the guilt of the servant and the guilt of the corporation; or the malice of the servant and the malice of the corporation; or the punishment of the servant and the punishment of the corporation, is sheer nonsense; and only tends to confuse the mind and confound the judgment. Neither guilt, malice, nor suffering is predicable of this ideal existence, called a corporation. And yet under cover of its name and authority, there is in fact as much wickedness, and as much that is deserving of punishment, as can be found anywhere else. And since these ideal existences can neither be hung, imprisoned, whipped, or put in the stocks, — since in fact no corrective influence can be brought to bear upon them except that of pecuniary loss, — it does seem to us that the doctrine of exemplary damages is more beneficial in its application to them, than in its application to natural persons.

The petitioners recognize that Maryland has uniformly applied the just-articulated "broad" rule of vicarious liabil-

ity for punitive damages,[10] yet they assert that in the context of defamation cases, we should fashion an exception in light of the policy of free expression fostered by the first amendment. To this end, Walker and the radio station propose that, limited to defamation cases, we require some degree of employer authorization, participation, or ratification of the particular defamatory act of the employee before liability will attach.[11] To do otherwise, the argument goes, will impermissibly allow "liability without fault" to attach in a defamation case in violation of the precepts of *Gertz v. Robert Welch, Inc., supra,* and "can only result in a self-imposed censorship of a most pernicious kind, in plain violation of the spirit of the first amendment." We do not agree, and find, first, that the petitioners' perceived constitutional imperative is illusory in this context, and, second, that the policy of free expression fostered by the first amendment is overridden here by the twin legitimate state interests of protecting its citizens from defamation (uttered with *New York Times* actual malice) and deterring such misconduct in the future.

The United States Supreme Court in *Gertz* addressed the question, among others, of what role the States may play in defining the standard of liability for defamation of a private

---

**10.** See Note, *The Assessment of Punitive Damages Against an Entrepreneur for the Malicious Torts of His Employees,* 70 Yale L.J. 1296 (1961).

**11.** Petitioners suggest that, even if it is not applied generally, the test contained in the Restatement, Second, of Torts, § 909 (and duplicated by § 217 C of the Restatement, Second, of Agency) should at least apply in defamation cases to the imposition of punitive damages against a principal for the defamatory conduct of the agent. Section 909 states as follows:

Punitive damages can properly be awarded against a master or other principal because of an act by an agent if, but only if,
   (a) the principal or a managerial agent authorized the doing and the manner of the act, or
   (b) the agent was unfit and the principal or a managerial agent was reckless in employing or retaining him, or
   (c) the agent was employed in a managerial capacity and was acting in the scope of employment, or
   (d) the principal or a managerial agent of the principal ratified or approved the act.

Section 909, in essence, represents the rule applied by a minority of jurisdictions to all claims for punitive damages based upon *respondeat superior.* See note 11, *supra,* and accompanying text.

individual who is neither a public official nor a public figure[12] and concluded that "the States should retain substantial latitude in their efforts to enforce a legal remedy for defamatory falsehood injurious to the reputation of a private individual." 418 U.S. at 345-47, 94 S.Ct. at 3010. On this basis, the Court then declared that the States are free to define the standard of responsibility in such cases "so long as they do not impose liability without fault" on a defendant in a defamation action. *Id. Gertz* did not concern the well settled principles of vicarious liability as applied by individual states; rather, it established the constitutional limits within which the states may operate when fashioning their own legal definition of defamation of a private individual so as to impose liability on the actual wrongdoer. There is no constitutional shield under *Gertz* for an employer acting through his agent with actual malice because the employer in such a situation *is* the wrongdoer.[13] *Gertz* is thus not dispositive here. Moreover, while the Supreme Court has shown a dislike for the imposition of punitive damages in cases involving First Amendment rights, it has permitted juries to levy such damages when liability is based upon a showing of "knowledge of falsity or reckless disregard for the truth." *Gertz v. Robert Welch, Inc., supra,* 418 U.S. at 349, 94 S.Ct. at 3011.[14] Consequently, in cases such as the one

---

**12.** Holly acknowledges that he is a public figure for purposes of this suit.

**13.** It is in this regard that the dissent in our view misreads *Gertz* and mischaracterizes *respondeat superior,* for an act done with "fault" in the constitutional sense can certainly be committed vicariously by an employer acting through its agent, and we perceive nothing in *Gertz* to the contrary. We note that many of the defamation cases to reach the Supreme Court in recent years have involved suits against corporate defendants for the acts done by the employees of the corporation. *E.g.,* Gertz v. Robert Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974); Rosenbloom v. Metromedia, Inc., 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971); Curtis Publishing Co. v. Butts, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967).

**14.** In *Gertz,* the High Court noted that although the States may define for themselves the standard for liability for defamation of a private individual, such liability extends only to compensatory damages. The Court went on to state that ". . . the States may not permit recovery of . . . punitive damages, . . . when liability is not based on a showing of knowledge of falsity or reckless disregard for the truth." 418 U.S. at 349, 94 S.Ct. at 3011. The universally recognized implication of the Court's curious use of the double negative here is that punitive damages are permitted when such "actual malice" is shown. See General Motors Corp. v. Piskor, 277 Md. 165, 175, 352 A.2d 810, 816-17 (1976); Maheu v. Hughes Tool Co., 569 F.2d 459, 479 (9th

before us, where petitioner Walker's defamatory conduct met this "actual malice" prerequisite for the imposition of punitive damages, the States' interest in safeguarding the reputation of its citizens comes to the fore. Certainly, it is important to protect First Amendment rights. It is equally important, however, when the defendant has acted with actual malice, to give protection to a person who has been so defamed and to discourage that kind of conduct in the future. See *Maheu v. Hughes Tool Co.,* 569 F.2d 459, 479 (9th Cir. 1977); *Goldwater v. Ginzburg,* 414 F.2d 324, 341 (2nd Cir. 1969) *cert. denied,* 396 U.S. 1049. In such cases, the wrongdoer has clearly put himself beyond the pale of the First Amendment, and we discover no reason, constitutional or otherwise, to shield an employer merely because the maliciously defamatory falsehood was uttered by its servant. The petitioners do not contend, nor in our view can they, that the master in such a case cannot constitutionally be held vicariously responsible for compensatory damages. Thus, we fail to perceive any logical reason why that document acts to prohibit vicarious liability for punitive damages; and we have already noted that imposition of punitive damages on the master for the appropriate tortious acts of its servant encourages greater employer accountability and serves to prevent employee misconduct by fostering supervision. Therefore, as it is the constitutional prerogative of the states to deter defamation uttered with "actual malice" through the imposition of punitive damages, see note 14, *supra,* we shall apply sound and well established principles of Maryland law here and hold that it is not error to permit the jury to impose exemplary liability on a master for the defamatory utterances of its servant where the employee acted in the scope of his employment and with knowledge of falsity or reckless disregard for the truth.

We turn now to address the second aspect of petitioners' contention concerning the award of punitive damages in this

Cir. 1977); Buckley v. Littell, 539 F.2d 882, 897 (2nd Cir. 1976), *cert. denied* 429 U.S. 1062; Appleyard v. Transamerican Press, 539 F.2d 1026, 1030 (4th Cir. 1976), *cert. denied,* 429 U.S. 1041; Carson v. Allied News Co., 529 F.2d 206, 214 (7th Cir. 1976); Davis v. Schuchat, 510 F.2d 731, 737 (D.C. Cir. 1975).

case, namely, that the Court of Special Appeals erred by reversing the trial court's decision permitting the jury to levy separate exemplary awards against Walker and Baltimore Radio Show, Inc. Respondent contends that we should apply the "traditional principles of joint and several liability" to punitive damages as has long been the rule regarding the underlying compensatory award.[15] However, the nature of punitive damages is such that in our view, this award should be apportioned between multiple wrongdoers in a proper case depending upon the degree of culpability and pecuniary status of each.

"It is axiomatic", we noted in *Wedeman v. City Chevrolet Co.,* 278 Md. 524, 531, 366 A.2d 7, 12 (1976), "that in appropriate cases [exemplary] damages are awarded, over and above full compensation, to punish the wrongdoer, to teach him not to repeat his wrongful conduct and to deter others from engaging in the same conduct." Many states, in recognition of these principles, have adopted the rule that punitive damages may be apportioned between wrongdoers either by providing varying amounts of such awards or by levying exemplary damages against some of the defendants but not others.[16] In our view, this is the most sensible approach to the subject, for punitive damages, in order to be fair and effective, must relate to the degree of culpability exhibited by a particular defendant and that party's ability

---

**15.** By statute, a joint tortfeasor who pays more than his pro rata share of a compensatory award may obtain contribution from his co-defendants. Md. Code (1957, 1979 Repl. Vol.), Art. 50, §§ 16-24.

**16.** *See, e.g.,* Davidson v. Dixon, 386 F.Supp. 482 (D.Del. 1974); Kim v. Chinn, 56 Cal.App.2d 857, 133 P.2d 677 (1943); Remeikis v. Boss & Phelps, Inc., 419 A.2d 986, 991-92 (D.C. App. 1980); L & N R.R. v. Roth, 130 Ky. 759, 114 S.W. 264 (1908); Nelson v. Halvorson, 117 Minn. 255, 135 N.W. 818 (1912); State ex rel. Hall v. Cook, 400 S.W.2d 39 (Mo. 1966); Bowman v. Lewis, 110 Mont. 435, 102 P.2d 1 (1940); Edquest v. Tripp & Dragstedt Co., 93 Mont. 446, 19 P.2d 637 (1933) (dictum); Hotel Riviera, Inc. v. Short, 80 Nev. 505, 396 P.2d 855 (1964); Sierra Blanca Sales Co. v. Newco Industries, Inc., 88 N.M. 472, 542 P.2d 52 (1975); Latasa v. Aron, 59 Misc. 26, 109 N.Y.S. 744 (1908); McCurdy v. Hughes, 63 N.D. 435, 248 N.W. 512 (1933); Mauk v. Brundage, 68 Ohio St. 89, 67 N.E. 152 (1903); Fredeen v. Stride, 269 Or. 369, 525 P.2d 166 (1974); Fredericks v. Commercial Credit Co., 145 S.C. 380, 143 S.E. 179 (1928); Huckeby v. Spangler, 563 S.W.2d 555 (Tenn. 1978); St. Louis & S.W. Ry. v. Thompson, 102 Tex. 89, 113 S.W. 144 (1908); Freeman v. Sproles, 204 Va. 353, 131 S.E.2d 410 (1963) (dictum). *See also,* Annot. 20 ALR 3d. 666 and later case service.

to pay. Punitive damages, in essence, represent a civil fine, and as such, should be imposed on an individual basis. *C.f., Logan v. State,* 289 Md. 460, 480-87, 425 A.2d 632, 642-46 (1981) (espousing prevalent modern penal philosophy of individualized punishment). To this end, it has long been the rule in Maryland that where an exemplary award is sought, evidence of the defendant's financial status is admissible in order that the jury may be provided a basis for fixing proper punishment for that particular wrongdoer. *E.g., Heinze v. Murphy,* 180 Md. 423, 431, 24 A.2d 917, 921 (1942); *Schloss v. Silverman,* 172 Md. 632, 643, 192 A. 343, 348 (1937). Thus, it is entirely conceivable, as petitioners point out, that without apportionment of punitive damages, "the admission of evidence of wealth of an affluent defendant can be devastating to an impecunious co-defendant who may well be far less culpable." And, as noted by the United States Supreme Court in this regard, "the verdict, enhanced by the evidence of the wealth of one defendant, might be collected from the defendant the least able to respond, and the least culpable of all, who would thus be mulcted in punitive damages, the amount of which might have been measured by the evidence of the wealth of another defendant." *Washington Gas-Light Co. v. Lansden,* 172 U.S. 534, 552, 19 S.Ct. 296, 303, 43 L.Ed. 543 (1899). Therefore, while a defendant who is least culpable may remain liable for all the compensatory damages suffered by plaintiff, given the purpose of a punitive award, there is no justice in allowing similar recovery of such damages in an action against several defendants based upon evidence of the wealth and blameworthiness of one other than he who must pay the exemplary award. Our predecessors recognized this problem in *Schloss v. Silverman,* 172 Md. 632, 192 A. 343 (1937), where, after determining that a malicious battery committed by a member of a partnership had occurred beyond the scope of the business (thus exonerating the partnership and its innocent members), the case was remanded for a new trial as to the wrongdoing partner. The Court explained that

[t]he jury may . . . in awarding exemplary damages and determining the amount which would suffi-

ciently punish the defendants, have been influenced by the net worth of the two individual defendants and the partnership. And since it cannot be assumed that they attempted to make the "punishment fit the crime", rather than the offenders, it does not follow that they would have awarded the amount in exemplary damages against one defendant worth less than $8,000, that they did against three worth over $68,000. [*Id.* at 644, 192 A. at 348-49.]

Accordingly, we hold that it is entirely proper to permit a jury to apportion punitive damages among multiple defendants, and shall reverse the judgment of the Court of Special Appeals in this regard.[17]

> *Judgment of the Court of Special Appeals affirmed in part and reversed in part.*
> *Costs to be paid equally by the parties.*

*Murphy, C. J., dissenting:*

While I have no disagreement with that part of the majority opinion enunciating legal principles governing the apportionment of punitive damages, I dissent from the majority's imposition of punitive damages against Walker's employer, the Baltimore Radio Show, Inc. The majority's decision flies in the face of accepted constitutional doctrine, *i.e.,* that "States may not permit recovery of presumed or punitive damages, at least when liability is not based on a showing of knowledge of falsity or reckless disregard for the truth." *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 349, 94 S. Ct. 2997, 41 L. Ed. 2d 789 (1974).

In *Gertz,* the Supreme Court attempted to balance the need to avoid media self-censorship with the legitimate state

---

**17.** Any indications contrary to the apportionment rule just articulated which have been perceived in the addendum to Nance v. Gall, 187 Md. 656, 674-77, 51 A.2d 535, 535-36 (1946), are hereby disapproved. *Compare* Meleski v. Pinero Restaurant, 46 Md. App. 526, 544-51, 424 A.2d 784, 794-97 (1981), *with* Cheek v. J.B.G. Properties, Inc., 28 Md. App. 29, 43-44, 344 A.2d 180, 189-90 (1975).

interest in compensating individuals harmed by defamatory falsehood. Gertz was the attorney in a civil action for a family whose son had been killed by a police officer. The defendant, Robert Welch, Inc., was the publisher of a John Birch Society newsletter. In one of its publications, the defendant characterized Gertz's efforts on behalf of the family as part of a communist conspiracy against law enforcement officers. In addition, the publication falsely called Gertz a "communist fronter" and the "architect" of the police officer's "frame-up." When sued by Gertz, the defendant claimed that its statements were privileged under the *New York Times v. Sullivan* "actual malice" standard, because the statements dealt with matters of public concern, notwithstanding the fact that Gertz was not a public official or public figure.

The Supreme Court rejected this argument, holding that private individuals need not prove "constitutional malice," and leaving it to the states to "define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood" as "long as they *do not impose liability without fault.*" 418 U.S. at 347 (emphasis added). In explaining this holding, and referring to punitive damages, the Court stated that the state interest in compensating a plaintiff for injury to reputation extends no further than actual injury. *Id.* at 348-49. Additionally, the Supreme Court noted the especially compelling danger of allowing jury awards without proof of loss in First Amendment cases. *Id.* at 349-50.

We embraced this reasoning in *General Motors Corp. v. Piskor,* 277 Md. 165, 175, 352 A.2d 810 (1976), where we allowed a plaintiff to "recover compensation for actual injury . . . but not presumed or punitive damages unless he meets the *New York Times* standard of knowing falsity or reckless disregard for the truth." *Accord Jacron Sales Co. v. Sindorf,* 276 Md. 580, 601, 350 A.2d 688 (1976).

Although *Gertz* dealt with private individuals, it is axiomatic that if a private individual cannot be awarded punitive damages, absent a showing of "constitutional malice," neither can a public figure, such as Dennis Holly. The record reveals a finding of "constitutional malice" against Johnny

Walker and the imposition of liability for punitive damages against his employer based solely on vicarious liability and *respondeat superior* principles. The majority bootstraps this purely policy-based liability into a full-fledged finding of fault. However, fault based on imputation is not, in my opinion, appropriate in First Amendment cases. Any sanction based on imputed fault, as opposed to actual fault, merely skirts the essential thrust of *Gertz.* As I see it, the balance reached in *Gertz* is a fragile one and the majority's opinion does nothing to maintain this equilibrium.

Dismissing the clear language of *Gertz* as "not dispositive" and describing, without explanation, petitioner's constitutional claims as "illusory," the majority declines to adopt the test contained in the Restatement, Second, of Torts, § 909 (1979), which provides:

> "Punitive damages can properly be awarded against a master or other principal because of an act by an agent if, but only if,
>
>> (a) the principal or a managerial agent authorized the doing and the manner of the act, or
>>
>> (b) the agent was unfit and the principal or a managerial agent was reckless in employing or retaining him, or
>>
>> (c) the agent was employed in a managerial capacity and was acting in the scope of employment, or
>>
>> (d) the principal or a managerial agent of the principal ratified or approved the act."

The Restatement test, by requiring some degree of employer authorization, participation or ratification of an employee's defamatory act before attaching punitive liability to the employer is constitutionally impelled by the mandate of *Gertz.* Therefore, I would adopt the Restatement test, reverse the punitive damage award against the employer, and remand for a new trial on that issue.

Judges Eldridge and Davidson authorize me to state that they join me in the views expressed herein.